## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL CASE NO. |
| v. | : | 17-CR-36 (JCH) |
| | : | |
| TONEY KELSEY, | : | August 8, 2018 |
| Defendant. | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

For at least a year and a half, Toney Kelsey preyed upon teenagers and young women, exploiting them for his prostitution business. As the evidence at trial demonstrated, he recruited his victims—including four seventeen-year-olds and one fifteen-year-old—on social media, after sending hundreds of solicitations asking potential victims if they were "down to make fast money." By one of his girlfriend's counts, he had more than 50 girls and women working for him over the course of approximately a year.

In his thirst for profit, he gave no regard to how his exploitation affected his victims, who have lasting trauma from their time with Kelsey and the "missions" on which he sent them. His fifteen-year-old victim, A.N., felt unsafe returning to her family's home because he had picked her up there, and her mother made the difficult decision to yield custody to the Connecticut Department of Children and Families ("DCF") to help keep her safe. While in the custody of DCF, A.N. has engaged in self-harming behavior. Other of his victims, a seventeen-year-old and a twenty-year-old, expressed suicidal thoughts during or shortly after their time with him. Kelsey left a trail of destruction in his wake, and the Court's sentence should reflect the severity of his crimes. As the court heard the trial witnesses and reviewed the Government's evidence during its case-in-chief, the Government defers to the Court to determine an appropriate sentence for Kelsey, in light of all of the factors set forth in 18 U.S.C. § 3553(a). The Government

1

believes, however, that a sentence of at least 240 months of imprisonment, or 20 years, will best serve the aims of Section 3553(a), including protection of the public and recognition of the seriousness of his crimes.

## I.     FACTUAL SUMMARY AND PROCEDURAL HISTORY

The Presentence Report ("PSR") accurately summarizes both the trial evidence and the remainder of the Government's investigation into Kelsey.  In brief summary:

<u>Sarah Packard</u>

The victim who used the pseudonym Sarah Packard at trial was recruited by Kelsey in May of 2015 during a party.  PSR ¶ 9.  Packard, who was then seventeen years old, was in the custody of the state child services agency in Kentucky when she moved to East Hartford to live with her great aunt and uncle.  PSR ¶ 8.  She and an adult woman named Sarah Beaulieu, who was also residing with the great aunt and uncle, corresponded with Kelsey's associate "Cheese" about coming to smoke marijuana at 462 Hillside Avenue in Hartford, where they later learned that Kelsey (also known as "Blaze"), his brother Justin (also known as "Smoke"), and their mother Patty Hamlett lived.  PSR ¶ 9.  During the evening, Kelsey asked Packard and Beaulieu if they were interested in making money through "escorting."  PSR ¶ 10.  Kelsey said that he would supply the clients and that they would split the profits 50/50.  PSR ¶ 10.  Kelsey set the prices and promised to act as "protection" for Packard and Beaulieu.  PSR ¶ 10.

A couple of days later, Packard and Beaulieu returned to Kelsey's house and accepted his arrangement.  PSR ¶ 11.  Kelsey and his brother took sexually explicit photos of Packard and Beaulieu for use in advertisements for their sexual services.  Kelsey created accounts on two

websites, Backpage and Cityvibe,[1] which advertise adult services (thinly-veiled prostitution

solicitations), so that he could recruit customers for Packard and Beaulieu.  PSR ¶ 12.  Kelsey

encouraged both to lie if they were ever encountered by police, saying that they were college

students who were escorting for the first time and who were not aware that they needed

"licenses" to escort.  PSR ¶ 14.  Kelsey was in charge of the operation, with his associate Red.

PSR ¶ 15.

Packard and Beaulieu would see customers at hotels ("in-calls") and at other locations

("out-calls").  Kelsey and his associates, including his brother Justin and another friend who used

the nickname "Red," would rent hotel rooms and transport Packard and Beaulieu to them.  PSR

¶ 15.  Kelsey called the dates "missions," and set the prices at $100 for 15 minutes, $150 for 30

minutes, and $200 for an hour.  PSR ¶ 16.  These prices were doubled because Packard and

Beaulieu would perform their appointments together.  PSR ¶ 16.  The first day, Packard and

Beaulieu earned approximately $800-$1,000, which they split with Kelsey and his associates.

PSR ¶ 16.  At various points during the six or so weeks when Packard worked for Kelsey in

prostitution, Kelsey had sex with her—including on days when there were not many prostitution

clients.  PSR ¶ 16.

Packard eventually told Kelsey that she was seventeen years old, and Kelsey was "ok

with it."  PSR ¶ 18.  He continued to promote her prostitution after that disclosure, but was

disappointed that Packard had lied to him.  PSR ¶ 18.

Packard stopped working for Kelsey in approximately late June 2015, after Beaulieu

reported to Packard's great aunt and uncle that she and Packard had been involved in

---

[1] In April 2018, the Department of Justice and Federal Bureau of Investigation seized Backpage and charged seven
of its employees with conspiracy, facilitating prostitution in violation of the Travel Act, and money laundering.
Shortly after that seizure, Cityvibe also ceased operations.

prostitution.  PSR ¶ 19.  Packard was returned to Kentucky, and Kelsey tried to recruit her to

come back to Connecticut.  PSR ¶ 20.  When Packard rebuffed his requests, he contacted a

Facebook friend of hers, Jasmine Morgan, who later traveled to Connecticut and became one of

his co-conspirators in the sex trafficking operation (as discussed further below).  PSR ¶ 20.

Alyssa Grant

In May of 2016, by posing as his then-girlfriend, Kari Yates, Kelsey recruited via social

media the victim who used the pseudonym Alyssa Grant at trial.  PSR ¶¶ 23-26.  Grant was

seventeen years old at the time.  He began by asking Grant if she wanted to make "$250/hr" with

"clients who pay hundreds for massages and sexual favors."  PSR ¶ 24.  During their initial

conversation, Grant told Kelsey that she could not go out that night because she had a 9:30 p.m.

curfew because of school, and also told him she was eighteen years old.  PSR ¶ 24.  At Kelsey's

request, Grant sent provocative photos of herself through the social networking application they

were using to communicate.  PSR ¶ 24.  A photograph of Grant appears in a Backpage ad posted

by Kelsey's account shortly after their initial conversation.  PSR ¶ 26.

A couple of days later, Kelsey, again posing as Yates, contacted Grant again through a

second messaging application.  PSR ¶¶ 25-26.  This time, Grant agreed to meet "K," the woman

she thought she was speaking to, that evening.  PSR ¶ 26.  Kelsey and Yates came to Grant's

grandparents' house; he was driving the vehicle that many witnesses identified as his and that

was registered to his mother.  PSR ¶ 27.  Grant, who was carrying only her house keys, an

iPhone that would only work when connected to a WiFi network, and a basic "emergency"

phone, got into the vehicle under a streetlight and testified at trial that she believed Kelsey could

see her face.  PSR ¶ 27.  Yates introduced herself as "K" and introduced Kelsey as "Blaze," her

boyfriend.  PSR ¶ 27.

After driving around to a few locations, including Kelsey's house (which was distinctive because of a burned rear garage that was lined with caution tape), Kelsey and Yates parked the car behind a halfway house and sexually assaulted Grant.  PSR ¶ 30.  Grant fell asleep; Kelsey and Yates woke her up some time later, saying that they had a customer for her.  PSR ¶ 31.  They instructed her to leave her eyeglasses in the car and gave her a phone she could use to contact them when she was done.  PSR ¶ 31.

Grant met the customer, a man in his 60s, in an apartment where she observed drug paraphernalia.  PSR ¶ 32.  She performed oral sex on him and, in return, he gave her a $175 money order.  PSR ¶ 32.  After she contacted Kelsey and Yates, they told her to go back in because the client had more money.  PSR ¶ 32.  The client was unable to get an erection on the second visit, so Grant left without any more money.  PSR ¶ 32.  Kelsey and Yates were upset that the payment was a money order, instead of cash.  PSR ¶ 32.

Kelsey and Yates then drove Grant to a second customer.  PSR ¶ 33.  Grant was upset and told the customer that she did not want to go back with the people who had dropped her off (Kelsey and Yates).  PSR ¶ 33.  The customer said he felt bad for, but still forced her to have sex, and gave her $50.  PSR ¶ 33.  He then accompanied her to meet Kelsey and Yates outside.  PSR ¶ 33.  Grant was upset and told Kelsey and Yates that she had called a friend to pick her up.  PSR ¶ 34.  Although Kelsey and Yates tried to convince her to come with them, they eventually left because they did not know if the "friend" Grant had said she called was the police.  PSR ¶ 34.  Grant eventually used her emergency phone, which she had retrieved from Kelsey's car, to call a friend to pick her up.  PSR ¶ 34.

Yates stated that during the period that she lived with Kelsey (approximately January to fall of 2016), more than 50 women and girls worked for him in prostitution.  PSR ¶ 39.  He

would create multiple social media accounts, often posing as Yates so that the potential recruits would believe that they were talking to a woman instead of a man. PSR ¶ 37. One of the social media applications, MeetMe, consistently shut down Kelsey's accounts because users would complain that he was recruiting them for prostitution. PSR ¶ 37. Kelsey provided his recruits with instructions about how to perform appointments, took at least 50% (and often more) of their earnings for providing clients and "protection" from clients, and gave his recruits "molly," a drug that helped them stay awake so they could make more money. PSR ¶ 38. Toward the end of Yates' relationship with Kelsey, she met Jasmine Morgan, Packard's friend who had moved from Kentucky/Ohio to Connecticut to be with Kelsey. PSR ¶ 40. Morgan was under the age of eighteen when she moved to Connecticut, and Yates stated that Morgan was working in prostitution for Kelsey before she turned eighteen. PSR ¶ 40. Morgan later became one of Kelsey's co-conspirators.

A.N.

Kelsey recruited A.N., who was then fifteen years old, on November 17, 2016. PSR ¶ 42. That day, A.N. had stayed home from school because she was not feeling well; according to A.N.'s mother, November is a difficult month for A.N. because a friend committed suicide in November 2015 and her father had a debilitating accident in November when A.N. was a young child. PSR ¶ 44.

On the morning of November 17, Kelsey engaged in a Facebook Messenger chat with A.N. during which he said that he had a "phone full of clients that pay hundreds for sexual favors." PSR ¶ 42. Kelsey asked A.N. how old she was and if she lived with her parents, and she falsely told him she was 17 and would have to be home by 2:30 p.m., to which he replied: "Cool u old enough." PSR ¶ 43. Kelsey then asked: "What happen if u don't will they call the

police," and then said:  "before I come send pics in bra and panties and chest and ass I need it for business."  PSR ¶ 43.

Shortly thereafter, Kelsey and his girlfriend Jasmine Morgan picked A.N. up at her home. PSR ¶ 45.  Kelsey and Morgan explained to A.N. the prices and the rules, including that the money would be split 50/50.  PSR ¶ 45.  Kelsey took a series of sexually suggestive and explicit photographs of A.N. posing in her underwear and topless.  PSR ¶ 46.  About 90 minutes after the photo session, Kelsey set up a "car date" for A.N.  PSR ¶ 47.  He and Morgan drove A.N. to an area near the library, where she entered a client's car and performed oral sex in exchange for $100.  PSR ¶ 47.

Later that evening, A.N. met a 20-year-old named Savannah Rosa, who had been working for Kelsey in prostitution for approximately one month.  PSR ¶ 49.  Kelsey initially lied to Rosa and told her that A.N. was eighteen years old, PSR ¶ 53, but later admitted that he knew she was seventeen (based on what A.N. had falsely told him).  PSR ¶ 53.  Over the course of the evening, Kelsey posted Backpage ads for Rosa's services, and Jasmine Morgan posted ads for A.N.'s services.  PSR ¶ 51.  All of these ads used fake photographs that did not actually depict Rosa or A.N.  PSR ¶ 51.  A.N. performed "missions," or prostitution appointments, PSR ¶ 52, and the group checked in to Room 130 at the Cityside Inn in Wethersfield, PSR ¶ 50. Surveillance video of the check-in showed that Kelsey paid for the room, but Rosa filled out the check-in paperwork in her name.  PSR ¶ 50.  Kelsey gave Rosa and A.N. "molly" while at the hotel because it would keep them awake and make them want to have sex.  PSR ¶ 54.

While the group was on their way to a mission for A.N., they got into a car accident and A.N. suffered facial injuries.  PSR ¶ 54.  They abandoned the car on the highway and Kelsey prevented Rosa from calling the police because he did not want to get caught with A.N., whom

he knew to be underage.  PSR ¶ 54.  Instead, a passerby offered the group a ride to Kelsey's

house, and then they returned to the Cityside Inn.  In the following hours, Kelsey set up

additional dates for A.N., at least one of which turned her down because of her facial lacerations.

PSR ¶ 56.  Rosa then got into a fight with Kelsey and Morgan, who left the hotel and would not

respond to calls or text messages.  PSR ¶¶ 57-58.  Rosa testified that she felt despondent and

wanted to kill herself, but A.N. comforted her and confided in her that she (A.N.) was only

fifteen years old.  PSR ¶ 58.  At that point, Rosa decided to call the police.  PSR ¶ 58.

Minor Victim 4

In the course of the investigation, agents learned of a fourth teenager ("MV-4") whom

Kelsey had recruited as a minor.  No evidence of this additional teenager was presented at trial.

Kelsey met MV-4 through Facebook in September 2016, when she was seventeen years old.

PSR ¶ 61.  As he had done with other victims, Kelsey told her he had a phone full of clients who

paid for sexual favors, and asked MV-4 to send photos of herself to him, which she did.  PSR

¶ 61.  Kelsey picked up MV-4 at her home and brought her to his house.  PSR ¶ 61.  Kelsey

arranged a prostitution appointment for MV-4 but she stated that she did not go through with the

appointment.  PSR ¶ 61.  The customer, feeling bad for her, gave her $30 and arranged for an

Uber to take her back to Kelsey's house.  PSR ¶ 61.  Kelsey was very angry that MV-4 had not

had sex with the client and refused to take her home.  PSR ¶ 61.  She ended up taking two

separate buses and a train to return to her mother's house.  PSR ¶ 61.  Kelsey tried to contact her

for a few days on Facebook, but she did not respond to him after the incident.  PSR ¶ 61.

Facebook Evidence

The Government conducted a search warrant of Kelsey's Facebook account, "Blazing

Flames."  Within the account, there were hundreds of messages to females with Kelsey's familiar

recruiting refrain about making "fast money."  There were also several photographs of Kelsey, including two with his face and a caption of "Waiting on $money $," and one of him with U.S. currency in his lap, which he told someone was "one day of work."  These, and other representative examples from Kelsey's Facebook account, are attached hereto as Exhibit 1. Additionally, a graphic of a woman kissing a man made of dollar signs was found on Kelsey's Samsung phone.  That is attached hereto as Exhibit 2.

Procedural History

Kelsey was arrested on state charges of trafficking in persons, coercion, and risk of injury to a minor, along with a probation violation, on November 30, 2016.  In conjunction with the execution of that arrest warrant, federal agents executed a search warrant of Kelsey's residence and vehicle, during which several items of evidentiary value were found, including the key to the room the group had stayed in at the Cityside Inn and numerous condoms.  Kelsey has been detained since the date of his arrest.

On February 22, 2017, federal grand jury issued an indictment charging Kelsey with conspiracy to commit sex trafficking of minors (Count One), and three counts of sex trafficking of minors (Count Two pertaining to Sarah Packard, Count Three pertaining to Alyssa Grant, and Count Four pertaining to A.N.)

Kelsey's trial commenced with jury selection on May 14, 2018, and evidence on May 15, 2018.  Evidence concluded and the parties delivered closing arguments on May 21, 2018.  The Government presented evidence consisting of Internet prostitution advertisements for the commercial sex of Packard, Grant, A.N., Beaulieu, and Rosa; records from Kelsey's cellular phone, email account, and computer; records from Grant's cellular phone; records from the Cityside Inn; records from phone companies; and records from Kelsey's Facebook account.  The

Government's witnesses were Connecticut State Police Detective Matthew Greenstein; FBI Computer Analysis Response Team Examiners John Boyer and Emanuel Hatzikostas; Wethersfield Police Department Detective Norberto Mendez; Sarah Packard; Beaulieu; Alyssa Grant; Kari Yates; Rasik Patel from the Cityside Inn; A.N.'s mother; and Rosa.  The defense presented no witnesses.

The jury began deliberating on May 21, 2018, and returned guilty verdicts on Counts One, Two, Three, and Four on May 22, 2018.  Because the jury did not unanimously find that Kelsey had a reasonable opportunity to observe Alyssa Grant, the Court directed a verdict of not guilty on Count Three.  Despite that the Court directed a not guilty verdict as to Count Three, the Court can still take that conduct into consideration when determining an appropriate sentence for Kelsey.  *See United States v. Watts*, 519 U.S. 148, 156 (1997) (even a jury verdict of acquittal "does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence").

## II.    GUIDELINES CALCULATION

The Government agrees with the PSR's calculation of the Sentencing Guidelines:

Count Group 1 (Counts 1 and 2):  Base offense level of 30, with two levels added because the offense involved the use of a computer or interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of the minor to engage in prohibited sexual conduct or entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor; two levels added because Kelsey had sex with Packard; and two levels added because the defendant was an organizer, leader, manager, or supervisor in the criminal activity.  This results in an adjusted offense level for this group of 36.

Count Group 2 (Counts 1 and 4):  Base offense level of 30, with two levels added because the offense involved the use of a computer or interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of the minor to engage in prohibited sexual conduct or entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor; and two levels added because the defendant was an organizer, leader, manager, or supervisor in the criminal activity.  This results in an adjusted offense level for this group of 34.

Multiple Count Adjustment:  A two level increase is added to the highest offense level from the groups, resulting in a combined adjusted offense level of 38.

Acceptance of Responsibility:  Kelsey has not clearly demonstrated acceptance of responsibility, so there is no downward adjustment.

Guidelines Range.  The PSR places Kelsey in Criminal History Category IV, resulting in an advisory Guidelines range of 324-405 months of imprisonment and a fine range of $50,000 to $500,000.

Defendant's Objections.  The only Guideline enhancement to which the defendant has objected is that pertaining to use of a computer or interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of the minor to engage in prohibited sexual conduct or entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor.  *See* U.S.S.G. §  2G1.3(b)(3).  Kelsey argues that because most sex trafficking cases involve the use of social media and online advertising to further or promote the offense, this enhancement "does nothing to distinguish one sex trafficking case from another."  Def's Sent. Memo at 5.  While the defendant is no doubt correct that the use of computers and/or cellular phones is prevalent in criminal enterprises, it is by no means the rule. While prostitution is common on Internet marketplaces such as Backpage, it also exists on street corners, in brothels,

and in massage parlors, where computers very well may not be used to solicit customers to engage in sex with minors. The Sentencing Commission was certainly within its mandate to conclude that the harm created by posting advertisements of children on the Internet—including photos that will likely last well beyond the life of the prostitution operation—is worthy of specific attention and enhanced punishment.

## III.    DISCUSSION OF SENTENCING FACTORS

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5)    any pertinent policy statement [issued by the Sentencing Commission];

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

<u>Seriousness of the Offense, Respect for the Law, and Just Punishment</u>

It is hard to fathom a deeper psychological victimization of a teenage girl than to be subjected to repeated sexual exploitation at the hands of strange men, "mission" after "mission,"

for even one night—much less more than a month, as in the case of Sarah Packard.  Yet Kelsey gave no heed to the well-being of the teenagers he victimized:  he simply used them for sex and money.  As the Government noted in its closing argument, Kelsey did not know these girls as human beings.  He knew them as human ATMs who could spit out cash for him.

Kelsey was obsessive in recruiting girls and women to work for him, as Kari Yates noted—so much so that social media applications would shut down his accounts due to complaints from their users.  Kelsey was undeterred by comments like this one from a potential recruit, which appeared in his Facebook messages:

> Kelsey:      Hey grogoues (sic.) u down to get Fast Money or Nah
>              Legally
>              Yes I got a phone full of clients that pay hundreds for sexual favors
>              300hour would u be down for that or nah
> Recruit:     N*GGA THAT'S NOT LEGAL! & I'm no prostitue (sic.) fuck out
>              my inbox

In the mere eight or nine months that she lived with him in 2016, Yates estimated that Kelsey promoted the prostitution of 50 people.  The sheer volume of Kelsey's enterprise merits a significant sentence, and Yates' figure would not even include most of the teenagers discovered in this investigation, as three of the four worked for him before or after Yates' time.

Kelsey has argued, essentially, that there are worse traffickers than he:  people who abduct and enslave girls and women, using rape, starvation, torture, and psychological abuse to force them into prostitution.  Def's Sent. Memo at 8.  Thankfully, none of the victims here had to endure physical abuse of that nature.  But Kelsey cannot escape the fact that he did endanger his victims simply by placing them into the hands of strange men for commercial sex.  Indeed, he purported to act as their "protection" if clients got rough—thereby acknowledging that there was a physical risk to their safety by the nature of the trade.  And even though he promised to protect the victims, on the one occasion when Packard and Beaulieu needed his help with a client who

had turned violent, he did not respond in time to offer any assistance.  PSR ¶ 17.  He also offered

and provided the victims with molly, a drug that he claimed would help them stay awake and

increase their sexual desire (so that they could make more money for him).

And Kelsey's argument misses the critical psychological damage that his actions have

inflicted on these youth.  As A.N.'s mother aptly recognized, Kelsey preyed on vulnerable girls

who could be emotionally manipulated:

> Mr. Kelsey targeted his victims and did so with little regret or regards for their
> wellbeing.  His actions were manipulative and calculated to ensure he profited off
> my daughter[']s innocence.  Now my daughter will never get her innocence back,
> and will need to live the rest of her life with a never ending nightmare that keeps
> her from sleeping at night.

Alyssa Grant's victim impact statement also acknowledges that the night she was with

Kelsey was "horrendous" and a "huge eye opener" because she didn't believe that what

happened could have happened to a girl like her.  She noted that she is not the "same girl" she

was before meeting Kelsey, and the experience changed her.

The Court should also consider that although the four minors in this case are the victims

for purposes of the sex trafficking charge, Kelsey also victimized and manipulated the three

adults who testified at trial:  Sarah Beaulieu, Kari Yates, and Savannah Rosa.  The Court

witnessed for itself the outward manifestations of fear and emotional trauma that caused

Beaulieu to break down emotionally and request a recess while testifying, and it heard how

Kelsey was emotionally abusive to and controlling of Yates during their months-long

relationship.  Yates could not even go to the bathroom alone without Kelsey watching her, and

he caused her to lose a home healthcare job because he accused her of cheating on him with the

patient.  Trial Transcript 5/17/18 at 191-192.  Rosa's impact statement acknowledges that when

she "look[s] at herself in the mirror," she "can't help but cry and feel angry of all that [Kelsey]

put [her] through."  According to her statement, Rosa has major depressive disorder, anxiety, and PTSD as a result of her time with Kelsey.  Kelsey had a pattern of abusing women and girls emotionally, a factor that should be considered by the Court.[2]

<u>Adequate Deterrence and Protection of the Public</u>

Kelsey argues that a sentence of the mandatory minimum ten years' imprisonment is adequate to deter him from committing crimes in the future, but offers no reasons why that would be true.  Kelsey's behavior during this prosecution, including at trial, evinces that he still believes that he did nothing wrong, despite the jury's verdict.  In his mind, he seems to distinguish between "escorting"/modeling girls and prostitution, believing the former is the legal activity in which he was engaged.  *See* Government Exhibit 330 (letter from Kelsey to Jasmine Morgan).  If Kelsey is sentenced to only ten years' imprisonment, he will be approximately 35-36 years old when released from prison, well within an age where he could resume his prostitution business.  Indeed, Congressional hearings on the topic of sex trafficking have found that this type of criminal enterprise is quite lucrative, when compared with the risks of being apprehended:

> First and foremost—from the perspective of the criminal offender—the economic gain of child prostitution or trafficking greatly outweighs the risks.  There is very low overhead in terms of cost for offenders, and the crime is rarely detected because it is difficult for law enforcement to identify minors engaged in juvenile prostitution or trafficking.

Domestic Minor Sex Trafficking:  Hearing Before the Subcomm. On Crime, Terrorism, & Homeland Sec. of the H. Comm. on the Judiciary, 111th Cong. 1 (2010), Statement of Anita

---

[2] As discussed further below, one of Kelsey's prior convictions from 2013 relates to his threatening to use a machete to break into the apartment of one of his former partners so that he could "snatch and kinap" her kids.  PSR ¶ 91.  He also threatened to "shoot up her house" and "shoot her kids outside."  PSR ¶ 91.

Alvarez, State's Attorney, Cook County, Illinois.  Sadly, all Kelsey will need to restart his prostitution business when he is released is an Internet connection.  There will always be a pool of vulnerable teenagers and young women whom he can meet online and entice into prostitution with promises of money.  The Court cannot have confidence that a sentence at the mandatory minimum of ten years would be sufficient to deter Kelsey from reentering the business—particularly because, during the term of his pretrial incarceration, he was directing Jasmine Morgan to continue the business in his stead.  *See* Government Exhibit 330 (letter from Kelsey's while he was in jail to Morgan, telling her to continue to do "what we know").

Because Kelsey poses a risk of recidivism—at least in part due to his attitude toward this crime—a sentence of at least twenty years would better serve the goal of protecting the public.  Kelsey did not discriminate in the girls he solicited online:  they came from all walks of life and from various areas of Connecticut and the Northeast.  None had been involved in the prostitution business, and at least one (Rosa) was in need of money when she got involved with Kelsey.  In that sense, the universe of women and girls that Kelsey could exploit in the future is broad, as the Internet greatly expands his reach.  In order to protect any potential future victims, the Court should impose a sentence of at least twenty years of imprisonment.

<u>History and Characteristics of the Defendant</u>

As defense counsel and the PSR note, little is known about Kelsey's history because he refused to participate in an interview with the probation officer.  What is available to the Court are his mental health records which demonstrate that he approached this case with a particularly obstinate and uncooperative attitude, and the reports of his prior convictions, which indicate that he poses a danger to society.

The Guidelines provide that mental and emotional conditions may be relevant in determining whether a departure from the Guidelines range is warranted, "if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines."  U.S.S.G. § 5H1.3.  Although Kelsey was diagnosed with bipolar disorder more than ten years ago, his most recent evaluation by Dr. Alissa Marquez at FMC-Butner, which occurred after the Court ordered a competency evaluation, found that he evinced a combative attitude and "criminal-oriented cognitive errors" that caused him to believe that he would get both his state and federal cases dismissed.  Dr. Marquez specifically found that, although Kelsey had a history of mental health conditions, his attitude and behavior toward the pending case were not to be viewed as a resurgence of those symptoms.  Rather, she found, "his continued attitude toward his case is reflective of poor judgment related to his personality, rather than mania."  Neither Kelsey's mental health history nor Dr. Marquez's report provides a basis for applying a departure under U.S.S.G. § 5H1.3.

Kelsey's prior convictions also demonstrate that he is dangerous.  The first of the two convictions, which occurred in 2009, involved Kelsey fleeing from police and throwing a loaded firearm off his person during the police pursuit.  PSR ¶ 90.  The second conviction, for which Kelsey was on probation when he committed the instant offenses, involved threats to kill the children of one of his former girlfriends.  PSR ¶ 91.  In particular, Kelsey broke into the house of his ex-girlfriend, allegedly because he believed she owned him money, and threatened to "snatch and kidnap" the girlfriend's children.  PSR ¶ 91.  The day before he was arrested, he had also gone to the house and threatened to commit a drive-by shooting, saying that he was going to

"shoot up her house, shoot her kids outside, and didn't care who was in the house."  PSR ¶ 91.

At the time of his arrest, he had a BB air pistol in the trunk of his vehicle.  PSR ¶ 91.

Although Kelsey's current case is of a different nature than these other two convictions, the common thread is that he has a pattern of committing crimes, often against women, even while being supervised on probation.  When taken in combination, the 2009 and 2013 convictions are particularly disturbing, since Kelsey was caught with a loaded firearm in 2009 and in 2013 threatened to shoot and kill innocent young children.  These convictions give context to A.N.'s post-recovery statement to police, which she made while "crying hysterically," that "he [Kelsey] knows where I live, he's going to kill me."  PSR ¶ 58.

Kelsey's history and characteristics thus weigh in favor of a lengthy sentence.

<u>Sentencing Disparities</u>

In support of his argument that a ten-year sentence is sufficient, Kelsey's sentencing memo cites a number of sex trafficking cases prosecuted in this District, with the accompanying sentences.  But, of course, the Court must sentence Kelsey based on the particular facts of his offense, and a list of prior cases with their sentences does not provide enough information for the Court to determine whether they are appropriate comparators to this case.  In particular, some of the cases that involved sentences near the ten-year mandatory minimum each involved the trafficking of only one minor victim (Damico, James, McKenzie, Anate); others involved sentences below the mandatory minimum (Dume, Williams, Gomez) or sealed sentencing filings (Brown).  Morris involved a pimp who beat one underage victim, and Prawl involved two minor victims; both cases resolved with guilty pleas.

The two most comparable cases for the Court to consider are those of Jarrell Sanderson and Edward Thomas.  Sanderson involved a defendant who promoted the prostitution of two

fourteen-year-old DCF runaways for approximately a week; he pleaded guilty without a plea agreement a few days before trial.  United States District Judge Mark Kravitz sentenced Sanderson to 310 months of imprisonment.  *See* 3:10CR56 (MRK).  Thomas involved a pimp who had previously been convicted of sex trafficking of minors, who recruited two minor victims from Oregon who had already been working in prostitution.  He was convicted after trial, and the Government, like here, argued for a sentence of at least twenty years' imprisonment. Senior United States District Judge Robert N. Chatigny sentenced Thomas to 210 months of imprisonment.  *See* 3:14CR31 (RNC).

Kelsey's case is among the more significant sex trafficking cases prosecuted in this District, given the number of minors he prostituted and the scope of his prostitution operation.  A sentence of at least twenty years of imprisonment would be appropriate for him.

## IV.    RESTITUTION

As set forth in the PSR, the minor victims in this case are entitled to restitution from Kelsey.  The Second Circuit has held that the proceeds a minor earns through prostitution when sex trafficked are owed to her as restitution, despite that they were earned through criminal conduct.  *See United States v. Mammedov*, 304 Fed. App'x 922, 927 (2d Cir. Dec. 30, 2008) (summary order) ("The express terms of 18 U.S.C. § 1593 require that victims in this case, i.e., persons who are engaged in commercial sex acts within the meaning of 18 U.S.C. § 1591, receive restitution, notwithstanding that their earnings from illegal conduct.").

Based on the Government's conservative estimates, Sarah Packard is owed $1,300, Alyssa Grant is owed $175, and A.N. is owed $375.  PSR ¶ 64.

## V.     SUPERVISED RELEASE CONDITIONS

The Government agrees with all of the proposed special conditions of supervised release except proposed special condition 10.  In that condition, the United States Probation Office has advocated for a condition of supervised release that allows Probation to conduct a "compliance review" of Kelsey's electronic devices "at a reasonable time and reasonable manner without prior notice or search warrant."  PSR ¶ 127, condition 10.  Based on the holdings of *United States v. Lifshitz*, 369 F.3d 173, 193 (2d Cir. 2004), the Government recently sought remand from the Second Circuit Court of Appeals in a child exploitation case in which an identical condition was imposed by United States District Judge Stefan R. Underhill.  *See United States v. Castro*, No. 17-2915.  On August 7, 2018, the Second Circuit granted the Government's motion for remand in *Castro*, which will allow Judge Underhill to reconsider whether to impose the compliance review condition.  The Government does not believe the Court should impose the compliance review portion of condition 10, particularly because the electronic monitoring provision of that condition should help detect any Internet usage that violates Kelsey's conditions of supervised release.

## VI.    CONCLUSION

For the reasons described above, the Government respectfully defers to the Court's discretion as to the appropriate sentence, but believes that a sentence of imprisonment of at least twenty years is warranted under the facts and circumstances of this case.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/

SARALA V. NAGALA (FED. BAR NO. phv05529)

20

MARC H. SILVERMAN (FED. BAR NO. phv04307)
ASSISTANT UNITED STATES ATTORNEYS
157 CHURCH STREET, 25TH FLOOR
NEW HAVEN, CT 06510
(203) 821-3700
Sarala.Nagala@usdoj.gov
Marc.Silverman@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2018, a copy of the foregoing Memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

/s/
SARALA V. NAGALA
ASSISTANT U.S. ATTORNEY